IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
    vs.    )    Cr. No. 22-0188 WJ
    )
**SHILO OLDROCK**,    )
    )
    Defendant.    )

## UNITED STATES' SENTENCING MEMORANDUM

The United States respectfully submits its Sentencing Memorandum in preparation for

Defendant Shilo Oldrock's sentencing hearing on November 27, 2023. The United States expects

members of each victim's family to address the Court at sentencing. The United States is

requesting the Court accept the plea agreement and sentence Defendant to 35 years of

incarceration, followed by 5 years of supervised release. As grounds, the United States provides

as follows:

## **PROCEDURAL HISTORY**

Law enforcement arrested Defendant on a criminal complaint for second degree murder

on October 14, 2021. (Doc. 2a). The Court held his initial appearance on October 15, 2021.

(Doc. 5). The Court held Defendant's preliminary hearing and detention hearing on October 20,

2021, though Defendant waived having these hearings. (Docs. 11-14). The Grand Jury indicted

Defendant on February 8, 2022, on one count of first degree murder pursuant to 18 U.S.C. §§

1153 and 1111. (Doc. 20).

On August 14, 2023, Defendant pleaded guilty to an Information to two counts, one

count for second degree murder pursuant to 18 U.S.C. §§ 1153 and 1111 and one count for

voluntary manslaughter pursuant to 18 U.S.C. §§ 1153 and 1112. (Docs. 40-44). The plea was made pursuant to Rule 11(c)(1)(C) with an agreement to a specific sentencing range of 20-35 years (240-420 months). All other conditions were left to the discretion of the Court.

On October 4, 2023, the United States Probation Office filed a Presentence Investigation Report (PSR). (Doc. 47). Therein, the PSR calculated the total offense level at 35. *Id.* at ¶ 65. As for Defendant's criminal history category, probation identified three state convictions from North Dakota, totaling a criminal history score of 6 for a criminal history category of III. *Id.* at ¶¶ 73-74. Defendant's guideline range of imprisonment is 210-262 months. *Id.* at ¶ 107. On November 22, 2023, Defendant filed his sentencing memorandum, where he requested a sentence at the low end of the range in the plea agreement, or 20 years.

For its part, the United States requests the top end of the agreed upon range, or 35 years of incarceration, for the reasons that follow.

## **FACTUAL HISTORY**

On or around January 29, 2021, Defendant participated in the killing of PS (John Doe 2). PS's family reported him missing after a family member found PS's vehicle abandoned on February 2, 2021. They had not seen or heard from him since January 29, 2021.

Months later in October, in the interview with law enforcement during the investigation into EB's (John Doe 1) death, Defendant shared some insight on what occurred. Defendant, EB and PS drank together on January 29, 2021. Later EB and PS fought one another, and Defendant stated he was jealous and wanted to hit PS too. Defendant told law enforcement that, as he watched EB and PS fight, he thought "hey let me fucking hit him a few times." Later, when PS seemed seriously injured, Defendant stated he felt the need to finish him off. So, acting on that

desire, Defendant grabbed an old metal iron[1], see below, and struck PS in the head with it more than one time. Defendant then confessed to law enforcement that he had the idea to burn the



body in the burn barrel and did so. He drew the iron to show law enforcement what he used and said he placed it in the burn barrel too. When law enforcement subsequently searched the property, they found human bones in the burn barrel previously described by Defendant. Among the bones, they found what appeared to be three radial heads, which is where the forearm bones meet the elbow. This is concerning, especially given that one person would only have two radial heads – one for each side. Therefore, these findings indicate that at least two and possibly three individuals were burned in that barrel.

---

[1] Two old metal irons were found in EB's home that matched the drawing made by Defendant in his interview. It is unclear which was used, but this is one of them and is provided for reference.

Approximately eight months after killing PS, Defendant came to believe he needed to kill EB as well. EB knew about the killing of PS, and Defendant worried that EB would snitch on him or try to kill him in retaliation. However, there is no evidence, other than Defendant's beliefs, that EB wanted to kill Defendant. Indeed, Defendant concocted unsupported theories, even when faced with evidence to the contrary, that EB killed his brother (Defendant's uncle), and EB's mother (Defendant's grandmother). One was ruled a suicide with supporting evidence, and the other was undetermined. The undetermined incident involving Defendant's grandmother seemed to be an alcohol related fall from the OMI report and law enforcement reports, but they could not conclusively determine that it was. Defendant also stated he was mad at EB for several reasons including that EB previously fought with Defendant's mother, that EB hit on Defendant's girlfriend, and because EB made fun of Defendant for dating his own cousin and then told others about it.

As for how this murder occurred, Defendant and his girlfriend were homeless, and EB would let them stay at his home. They all abused alcohol, and used marijuana. Defendant abused methamphetamine in addition to those other substances. Defendant and EB fought at times when drinking, including about a week prior to the killing when Defendant threatened EB with an ax, beat EB up, and locked EB out of his own home.

On the morning of October 10, 2021, Defendant hitchhiked a ride to the flea market. Covered in blood, Defendant told the driver he killed EB. Defendant admitted to the driver that he started the fight and threw EB down the stairs. Defendant then stabbed EB 22 times and chopped off his head. He placed EB's head inside the wood stove. After this slaying, Defendant wanted a ride to the flea market to see his mother. Defendant had previously left her a message about needing to "handle" some people. Defendant proceeded to send her a picture of EB's dead

body, followed by a picture of cooked hamburger meat. After dropping off Defendant, the driver called someone and asked them to go check on EB because he was worried for him after what Defendant told him. The other individuals went and found EB's remains and called police.

Law enforcement found EB's decapitated body in front of the house. They saw a bloody ax and blood smears leading up the stairs to the front door of the house. Inside the blood smears lead to the wood stove. Inside the stove they found the charred head of EB. When interviewed, Defendant admitted to killing both EB and PS. Defendant stated he was jealous that something might have happened between his girlfriend and EB, and provided some of the other reasons he thought justified killing EB.

The Office of the Medical Investigator (OMI) produced reports for both killings. For PS, they have human bones, but the thermal damage to the bones was severe, with damage suggesting Defendant burned the remains at a temperature hotter than 1200° F. Unfortunately, thermal damage that severe makes it nearly impossible to recover DNA, and they could not from the remains. For EB, OMI reported his remains showed thermal damage and charring to the head, broken facial bones, skull fractures, decapitation at the C5/C6 vertebrae done by a large irregular chop wound, broken ribs, 22 stab wounds, along with various bruises and scrapes. The 22 stab wounds clustered on the right side of the body. They punctured the right lung, liver, hemidiaphragm, right kidney, small intestine, and other injuries to the right side of his torso. EB's blood alcohol level was a .29, or more than three times the legal limit in New Mexico. OMI determined the manner of death to be homicide. Defendant is a member of the Spirit Lake Sioux Tribe, and the killings took place within the exterior boundaries of the Navajo Nation in New Mexico.

**ARGUMENT**

Although the Guidelines range in this matter comes out to 210–262 months, there is sufficient justification to sentence Defendant to 35 years in the Bureau of Prisons. For one, the facts in this matter support first degree murder, which comes with mandatory life or death, so Defendant has already received a significant benefit by entering into the plea agreement. And that benefit, i.e., avoiding mandatory life, warrants 35 years. Second, the reduction in exposure aside, the sentencing factors and the guidelines also point to the United States' requested sentence.

To begin, the United States Sentencing Guidelines (USSG) and the 18 U.S.C. § 3553(a) factors direct that an appropriate sentence for Defendant would be at of the top of sentencing range of the plea agreement. As discussed herein, the United States is requesting the Court sentence Defendant to the maximum term of incarceration to be followed by a term of five years of supervised release. The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient but not greater than necessary to achieve the statutory purposes of federal sentencing. *See United States v. Booker*, 543 U.S. 220 (2005). Among other considerations, these factors take into account the nature of the offense, the defendant's history, seriousness of the charge, and the applicable guideline range. 18 U.S.C. § 3553(a).

Based on Defendant's actions prior, during, and subsequent to the crimes charged, Defendant should receive a sentence of 35 years of incarceration. To be sure, after considering the factors, a district court may apply a variance if it ensures "the justification is sufficiently compelling to support the degree of the variance." *Gall v. United States*, 552 U.S. 38, 50 (2007). A "major" variance should have "a more significant justification than a minor one." *Id*. Nevertheless, there is no "appellate rule that requires 'extraordinary' circumstances to justify a

sentence outside the Guidelines range" and "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id*. at 47.

Here, in addition to the elimination of mandatory life (or death), which again warrants 35 years, the terms of the sentencing agreement within the plea agreement assume that a variance or departure could be appropriate in this matter. The variances and/or departures discussed below are used to further justify a sentence at the high end of the range in the plea agreement. That is, the below analyses of various guideline provisions are used to illustrate that the requested sentence is not extraordinary in the least, but instead grounded firmly in statute and in the Guidelines. It is further included to inform the § 3553(a) factors discussed below, which likewise support a sentence of 35 years.

### A. Upward variance due to death pursuant to USSG § 5K2.1

The offense guidelines in this case do not properly consider the harm caused by the loss of multiple lives and the dangerousness of Defendant. "[T]he fact that [Defendant]'s crime caused the deaths of several victims is clearly a relevant consideration in determining the appropriate sentence. 'Courts have always taken into consideration the harm done by the defendant in imposing a sentence.'" *United States v. Lente*, 759 F.3d 1149, 1162 (10th Cir. 2014). The harm caused goes to the first factor under 18 U.S.C. 3553(a). *Id.* Additionally*,* under the guidelines, "[i]f death resulted, the court may increase the sentence above the authorized guideline range." USSG § 5K2.1. Some of the factors to look at are if Defendant caused multiple deaths and the dangerousness of Defendant's conduct. *Id.*

Here, Defendant killed two individuals, yet even the Sentencing Guidelines do not factor the second killing in his sentence. There is no enhancement for multiple killings in the

guidelines, and, perhaps unintentionally, indicate that the loss of life for PS is inconsequential. However, the harm to the family of PS weighs immensely on them. The Sentencing Guidelines provides no sense of justice to them other than the peace of mind that comes with finally knowing what happened to their missing loved one. The proposed range does not adequately address the harm caused as it does not provide for any measure of additional punishment for the death of PS, and an upward variance is necessary to address it. *See Lente* at 1163. Some of the caselaw for multiple deaths stems from DUI crashes or the same act where multiple individuals die, and an upward variance was justified. *See Id.; United States v. Goodman*, 827 F. App'x 826, (10th Cir. 2020)(unpub.), *United States v. Munoz-Tello*, 531 F.3d 1174-1177-81 (10th Cir. 2008) (upward departure related to multiple deaths for alien smuggling).

Not only do we have the harm for multiple deaths, but they came about from multiple acts. This contributes to the dangerousness of his conduct. Defendant's acts involved decapitation in one case, and burning the remains of his victims in both cases. Defendant then travelled blood-soaked to the flea market. He sent his mother an image EB after he slayed him, almost like it was a trophy. All of this indicates a deep lack of remorse or sense of the gravity of his wrongdoing.

The Court can provide some justice to the families. While nothing will bring back their loved ones, the Court should vary upwards and sentence Defendant to the maximum sentence under the plea agreement – 35 years of incarceration. This would provide additional punishment for the harm caused by Defendant for two killings and the taking of two lives. He killed PS, and then claims he killed EB out of fear because of the PS killing. The guidelines do not punish Defendant for this additional killing. We ask that the Court does, and sentence Defendant to the maximum under the plea agreement.

**B. Upward variance for extreme conduct pursuant to USSG § 5K2.8**

Related to the dangerousness of Defendant, his conduct was nothing short of extreme. "If the defendant's conduct was unusually, heinous, cruel, brutal or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. . . includ[ing] torture, gratuitous infliction of injury, or prolonging of pain or humiliation." USSG § 5K2.8. This case clearly sits outside the heartland of traditional second degree murder convictions and voluntary manslaughter cases. *See generally United States v. Brave Bull*, 828 F.3d 735, 740 (8th Cir. 2016). It does not matter whether the victim is dead or unconsciousness when the heinous behavior takes place. *United States v. Hanson*, 264 F.3d 988, 999 (10th Cir. 2001). It is the conduct of the heinous acts committed by Defendant that matters. *Id.* at 998-99.

As noted in the PSR, Defendant operated in an extreme and heinous manner. PSR at ¶¶ 124-125. Defendant stabbed EB 22 times, before decapitating him and placing his head inside a wood stove. After Defendant killed EB, he sent an image of EB to his mother and then an image of cooked hamburger meat. This is disturbing behavior considering he decapitated EB and put his head in a wood stove causing thermal damage to EB's head. In the other case, Defendant used an old metal iron to bludgeon PS to death before burning his body leaving not but brittle bones. Defendant expressed jealousy that he had not had a chance to hurt PS, which may have caused him to use the iron rather than his fists.

Defendant's behavior shows a penchant for causing gratuitous infliction of injury to his victims. This is behavior at least similar, if not even more egregious, to other cases upholding this enhancement. *See United States v. Chase*, 451 F.3d 474, 483 (8th Cir. 2006) (stabbed victim at least 5 times, then kicked immobilized victim causing gratuitous infliction of injury); *United States v. Quintero,* 21 F.3d 886 (9th Cir. 1994) (defendant killed, burned, and decapitated 2 year

9

old daughter); *United States v. Grey Cloud*, 90 F.3d 322 (8th Cir. 1996)(case involving dismemberment); *United States v. Livingston*, 2022 WL 15570654 *7 (10th Cir 2022) (unpublished) (victim beaten, kicked, stomped and struck with a flashlight and left to die). Here Defendant committed multiple killings in an extreme level of violence that was cruel and justifies a variance upwards and supports a sentence of 35 years.

## C. Upward variance for dismissed or uncharged conduct pursuant to USSG § 5K2.21

Next, the Court may consider dismissed and uncharged conduct in reaching a final sentence. *See, e.g., United States v. Allen*, 488 F.3d 1244, 1254-55 (10th Cir. 2007) (The conduct that a sentencing court may consider "comprises more, often much more, than the offense of conviction itself, and *may include uncharged and even acquitted conduct*." (emphasis added)). Additionally, "[t]he Court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range." USSG § 5K2.21. Other allegations include Defendant attacked someone with ax, struck a child with a piece of firewood, and may have participated in other murders. The guideline calculation does not include any of the harm caused to any of them. *See generally United States v. Zunie*, 444 F.3d 1230, 1237 (10th Cir. 2006); *United States v. Fraser*, 647 F.3d 1242, 1247 (10th Cir. 2011); *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1131 (10th Cir. 2006).

There were other crimes Defendant committed that are not incorporated into this plea or the sentencing guidelines. This includes the attempted murder of Defendant's girlfriend's ex-boyfriend, ETV, and child abuse. PSR at ¶¶ 67-68. Defendant attacked ETV because Defendant's girlfriend spoke with ETV for too long on September 16, 2021, just a few weeks

before the killing of EB. Initially, Defendant threw a rock which struck the victim's truck. Then Defendant chased ETV with an ax, threatened to kill him, and threw pieces of firewood and an ax at him. One of those pieces of firewood ricocheted and hit ETV's child, who he was holding. This caused the child a minor injury and to bleed from the head. Defendant stated he wanted to kill ETV, grabbed another ax and continued to chase and swing the ax at ETV. ETV estimated Defendant swung the ax at him about seven times. ETV believed Defendant was trying to kill him when he swung the ax at him and that his life, and possibly his daughter's, was in danger.

Similar to the justification under multiple deaths, the killing of PS could have had a higher charge. Defendant demonstrated the malice aforethought to justify another second degree murder charge (or possibly another first degree charge). Defendant acted deliberately and intentionally, or with callous and wanton disregard for human life when he decided to kill him because he was already injured. According to Defendant, PS and EB fought, and PS was injured. Defendant stated he was mad at EB because he wanted to hit PS too. Defendant insinuated that he was putting him out of his misery and needed to finish him off, *i.e.*, premediated intent to kill or malice aforethought, which ignores the appropriate response should have been to call for assistance rather than strike a death blow. At one point, Defendant said he was angry as PS previously dated his mother and said mean things about her.

Additionally, there is the concern Defendant was involved in additional murders. As recounted in the anthropology report which OMI included in the autopsy report, they found three radial heads. This indicates at least one individual, and possibly more individuals, besides PS were burned in the barrel or in a burn pit in the backyard. The radial heads would have had to come from 2 or 3 different individuals. However, due to the severe thermal damage from burning it was not possible to further identify who the bones belonged to. Additional reports indicate a

witness saw Defendant with an individual currently listed as a missing person. This is the last time known to investigators that the individual was seen alive.

Should the Court believe these other events are too remote to the crimes of conviction, they should be considered for a variance under 18 U.S.C. § 3553(a) for the history and characteristics of the Defendant and Defendant's history.

### D. Departure based on Inadequacy of Criminal History pursuant to USSG § 4A1.3

Defendant's criminal behavior justifies a departure to Criminal History Category V. "If reliable information indicates that the defendant's criminal history category substantially underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted." USSG § 4A1.3(a)(1); *See also United States v. Akers*, 215 F.3d 1089, 1104 (10th Cir. 2000). "[T]he Guidelines expressly allow a district court to depart upward based on underrepresented criminal history." *United States v. Lente*, 759 F.3d 1149, 1167 (10th Cir. 2014). The Court may use uncharged conduct or conduct that did not result in a criminal conviction to depart or vary upwards. USSG § 4A1.3(a)(2)(E). "The facts underlying the arrests are fair game." *United States v. Robertson*, 568 F.3d 1203, 1212 (10th Cir. 2009). Defendant's history of violent behavior justifies a variance or departure upward. USSG § 4A1.3(a)(1). *See United States v. Aaron*, 790 F. App'x 150, 156 (10th Cir. 2019)(unpublished) ("past criminal conduct need not be identical to the instant crime of conviction. Rather, it must simply be similar enough to suggest higher culpability or likelihood to recidivate than the typical case.").

Here defendant has six charges from the Navajo Nation, two from North Dakota, and the other charges not pursued by the United States due to this plea agreement for attempted murder, those being child abuse and assault. This provides an alternative to enhancing Defendant's

sentence should the Court decide USSG § 5K2.21 as not being a correct enhancement to use for the uncharged felony. Had Defendant been convicted of the attempted murder, it would have been a 3 point enhancement, but it occurred too close in time to the murder of EB. Defendant should not receive a benefit for committing a series of violent crimes close together. Rather it warrants enhancing his crime of conviction.

In addition to that felony, one of Defendant's tribal charges on the Navajo Nation relates to battery. This demonstrates a pattern of failing to follow the law, including many warrants and failures to comply. Defendant's behavior indicates he will likely reoffend, in violent ways. Should points for the additional criminal behavior and points for a felony and a misdemeanor get added to the number of criminal history points for Defendant, it would be a total of 10 criminal history points. This would raise his category to V and change his range to 262-327 months. Again, this is just another example of why the Court should sentence Defendant to 35 years, and the PSR does not fully grasp the seriousness of the offenses and Defendant's dangerousness.

**E.  Upward variance for Criminal Purpose pursuant to USSG § 5K2.9**

Defendant killed EB out of concern that he might harm Defendant or report Defendant to law enforcement because Defendant killed PS. The Court should increase Defendant's punishment since he killed EB for a criminal purpose: Defendant attempted to conceal the commission of the other offense. USSG § 5K2.9

Defendant told the FBI he had been warned not to snitch and feared EB might kill him because of what happened with PS. Defendant stated he feared EB might try to kill him, so he decided to kill him first. Defendant admitted this to the FBI and in the plea agreement. (Doc. 43, ¶ 9). A variance would reflect the need to punish for the severity of the crimes, and to discourage individuals from continually committing crimes to cover up or hide the harm caused form the

original crime. This behavior continues to demonstrate an extra-level of depravity for Defendant. *United States v. Nuckolls*, 166 F.3d 1222 *2 (10th Cir. 1999) (unpublished).

**F.  Motion for upward variance for Obstructing or Impeding the Administration of Justice pursuant to USSG § 3C1.1**

Defendant obstructed the investigation in these killings. If "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and the behavior related to the Defendant's offense of conviction. USSG § 3C1.1. If applied, this would increase the offense level by two.

With respect to the killing of PS, Defendant took several steps to cover up his conduct. He burned the remains of PS, and got rid of his clothes and other belongings because they were not found in the house. Law enforcement found buttons and rivets from jeans indicating he burned the clothes as well. Defendant admits in his interview with law enforcement it was his idea to burn PS's remains. He also suggested he tried to burn the iron he used to kill PS, which would explain why no DNA was recovered on the iron. On top of that, it appears they drove and ditched Defendant's car away from the house in order to not draw attention and possibly reveal they killed PS. Even if the behavior was merely aiding and abetting EB to do the obstructive conduct, the enhancement would apply. USSG § 3C1.1 n. 9. Defendant intentionally obstructed the investigation by burning the remains, the murder weapon, items of evidence, and ditching PS's vehicle. For the killing of EB, Defendant appears to have hidden the knife and attempted to burn EB's head. All of these actions were done to obscure the investigation and to avoid apprehension.

Should the additional enhancement apply only to the voluntary manslaughter charge for killing PS, it would add 2 to the total offense level. This would raise the total to 31 for the voluntary manslaughter charge, which in turn qualifies for a half level under USSG § 3D1.4. This would add one offense level to the total offense level for the second degree murder charge, and raise its total offense level to 36. Assuming a criminal history category of III, this would increase the sentencing guideline range to 235-293 months of incarceration. Should obstruction directly apply to the second degree murder charge, Defendant's offense level would increase to 37, and under criminal history category III, Defendant's sentencing guideline range would be 262-327 months of incarceration. However, should the criminal history category be increased to V as requested in subsection D above, the sentencing guideline range for offense level 37 and category V would be 324-405 months of incarceration. Again illustrating the seriousness of offenses and Defendant's danger to the community as he concealed his behavior enabling him to commit more heinous crimes.

## THE SENTENCING FACTORS

With the above departure pathways as guidance, it becomes clear that, under a traditional sentencing analysis, the United States' requested sentence is grounded in reason. Under the standard sentencing factors under 18 U.S.C. § 3553(a), they too provide justifications for sentencing Defendant above the guideline recommendation and justify a sentence of 35 years of incarceration. The aforementioned variances stand alone as justifications for a sentence outside the guidelines, but also work with the traditional sentencing factors to illustrate Defendant warrants a sentence at the high end permitted under the plea agreement.

### A.  Nature, circumstances and seriousness of the offenses

Defendant's acts show a clear danger to the community. As such the variance could also be based on 18 U.S.C. § 3553(a)(2)(C). *United States v. Pinson*, 542 F.3d 822, 837 (10th Cir. 2008). Defendant's repeated violent behavior, the killing of at least two people, child abuse and attempting to kill another person shows he poses a clear and immediate danger to the public. Defendant's violent tendencies, lack of respect for the law, and repeated criminal acts warrant an upward variance under 3553(a) factors. *See United States v. Yarclay*, 861 F. App'x 246, 250 (10th Cir. 2021) (unpublished).

The offenses themselves contain unsettling facts. Stabbing someone 22 times, and then beheading them and placing their head in an oven shows a depraved mind and a complete indifference to human life. Defendant could not settle on one motive for why he killed EB. He vacillated from blaming him for the death of his grandmother, then blaming him for the death of his uncle, then for being present when he killed PS, then it was for EB hitting on his girlfriend, that EB at some point previously became upset and threw Defendant's mother to the ground, and still another version was he was upset that EB spoke out about him being in a relationship with his cousin to other people. For the last purported justification, he claimed he would "do something about it. I'll get rid of him. Everything is premeditated." PSR at ¶ 67. He made this statement on September 16, 2021, only a few weeks before the murder. Police reports show Defendant assaulted EB about a week before he killed him. Defendant deliberated on how he would hurt EB, and then executed his plan.

It was a vicious and deliberate plan. The report from OMI shows a plethora of injuries to EB. It includes the thermal damage and charring to the head, broken facial bones, skull fractures, decapitation at the C5/C6 vertebrae done by a large irregular chop wound, broken ribs, the

aforementioned 22 stab wounds, along with various bruises and scrapes. The 22 stab wounds punctured the right lung, liver, hemidiaphragm, right kidney, small intestine, and other injuries to the right side of his torso. This shows a degree of ferocity not normally seen. Defendant then decided to take a photo of what he had done and send it to his mother, along with an audio message that said, "these motherfuckers need to get handled too," and sent her a photo of cooked hamburger meat. This behavior continued to show a level of depravity and lack of remorse for his actions. Later still, he hailed down a vehicle to drive him to the flea market to see his mother, and admitted he initiated the attack by throwing EB down the stairs, killing EB, chopping off his head and putting the head in a wood stove because he was angry at him.

EB's family stated that he was a kind individual who would help out his family. EB's family relied on him to help them out, and dearly miss him. The family members that went into the home and smelled EB's head burning in the wood stove and burnt chicken found in a crockpot, shared going in the home ruined certain types of food for them because it too closely resembled the smell from the burning flesh.

With regards to PS, Defendant saw someone hurt, and instead of trying to help or get him help, he expressed a desire to "finish him off." Defendant shared he was upset he did not get to hit PS enough, and then he grabbed an old metal iron and struck PS with it multiple times. Defendant burned the body, and then it appears he ditched PS's vehicle to hide what had been done. This left PS's family wondering if he would ever return. They reported him missing after his vehicle was found, but no trace of PS. Eventually, PS was listed on the FBI's list[2] of Native American missing persons throughout New Mexico and the Navajo Nation. PS's family stated

---

[2] List of Native Americans Verified as Missing Throughout New Mexico and the Navajo Nation — FBI:
www.fbi.gov/investigate/violent-crime/indian-country-crime/missing-and-murdered-indian-persons-list

they searched for him for two years. They went looking in canyons and placed advertisements on the radio, Facebook, and other places looking for information as to what happened to PS.

Defendant attempts to portray a new version of events in his sentencing memorandum. However, in every prior statement, he told people he planned on killing EB, and described to them and law enforcement how and why he did it. He raises the possibility only now at sentencing that it might have been in self-defense, contradicting all of his own prior statements.

Similarly, with regards to the killing of PS, Defendant proceeds to minimize his role and blame EB. Again, he previously stated he wanted to participate in the altercation between EB and PS and was mad that he had not had the opportunity to hit PS. He made no mention of distancing himself from the situation or going to another room in his other statement, but rather expressed his desire to join in the altercation, which lead him to grab the metal iron and strike PS repeatedly. Defendant confirms he used alcohol and abused methamphetamine. Additionally, he continues to try to blame EB for his mother's death. There is no conclusive evidence to suggest EB killed his mother (Defendant's grandmother). EB from the beginning stated she fell in the night, and he found her on the floor covered in blood in the morning. She had a blood alcohol level of .22 and drank a bottle of vodka the day before with EB, as well she had other health issues. The OMI report states head trauma as the cause of death, likely from slipping or falling, but the OMI report could not rule out other causes for a traumatic head injury.

Defendant's killings demonstrate a level of cruelty and brutality not found in most homicides. His behavior warrants a variance upward for the level of violence used in these killings. The forensic anthropologist report details thermal damage to the suspected remains in the barrel used to burn PS, and likely others, of reaching at least 1200˚ F based on the condition and fragmentation of the bones. Defendant obliterated the remains of those he killed, and in none

of the interviews with law enforcement or statements to family did he show the least bit of remorse for what he did. Rather, he showed a desire to hurt others.

The family had been left in the dark about what happened to PS. They are just beginning to grieve as they were only informed recently that PS was deceased, rather than missing. With this resolution, PS's elderly aunt can stop looking down the driveway in hopes that her nephew might still one day come wandering up it. The family is still planning on having a funeral for him. While EB's family has known for some time of the killing, they state they are afraid of Defendant based on what they have seen and heard. Both families hope to see Defendant punished with as much time in custody as possible.

### B.  Defendant's past conduct and history

With regards to Defendant's character and nature, Defendant does have criminal history that appears to stem from substance abuse and other violent behavior. Defendant was convicted in North Dakota of child abuse from an incident in 2014. He then received an escape charge and was convicted in 2018.  He violated a variety of conditions while on supervision, including using methamphetamine and failing to complete his classes and counseling.

There are reports Defendant physically abused his girlfriend and EB in the past. EB was one of the few individuals that let Defendant stay with him because of Defendant's violent behavior. His substance abuse and behavior meant most family feared him and would not permit him to be around. His girlfriend's mother forbid him from her house and repeatedly kicked him out, once at the end of a shotgun, due to the repeated abuse she saw to her daughter. Defendant confirmed this in his interview and said the mother kicked him out after he "smacked" his girlfriend in the mouth. The mother made Defendant leave and pointed a shotgun at him to insure he left.

EB was physically abused by Defendant on more than one occasion. The week prior to the killing, Defendant foreshadowed what was to come by assaulting his uncle and using or threatening use of an ax according to law enforcement reports. Defendant's girlfriend used this opportunity to get away, and left Defendant while he was in custody for disorderly conduct.

Defendant's mother also called police on him due to his fighting with his brother. Defendant resisted arrest taking an officer to the ground when intoxicated according to law enforcement reports from May 27, 2021.

There is the aforementioned attempted murder, which is more fully laid out above, but there is also the concern for what was found in the burn barrel. Finding three radial heads suggests that at least two, and possibly three, different individuals would be associated with those bones. There is concern those remains belong to another male on the FBI's missing list that previously had a romantic relationship with Defendant's mother. A witness saw Defendant with that person, and it was the last known time that individual has been seen. However, due to the extreme thermal damage of the remains, it is not possible to use DNA analysis to identify whose bones law enforcement found. This is concerning, but may never fully be resolved.

This pattern of behavior shows he is not a person that is suitable for a lenient sentence. Defendant shows no respect for the law with his past probation violations and escape charges. There is no indication Defendant rehabilitated his ways, and his spate of violent conduct shows his behavior only became worse.

His substance abuse history indicates that whenever he is released, he will need the full amount of supervised release in order to monitor his behavior. Defendant does not show any interest in any substance abuse services at this time to prevent him from relapsing, and does not want to try RDAP. Currently, Defendant continues to use drugs while in custody. PSR ¶ 77. His

pattern of violent criminal history suggests the need for anger management and other forms of counseling. The lack of desire to seek help suggests the need for a longer term of supervision to help with his rehabilitation after his term of incarceration.

## CONCLUSION

For the reasons described above, the United States respectfully requests that the Court accept the Plea Agreement in the above-captioned matter and sentence the Defendant to the maximum under the agreement of 35 years of incarceration to be followed by five years of supervised release.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically filed 11/22/2023*
NICHOLAS J. MARSHALL
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico 87102
(505) 224-1517

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court
using the CM/ECF system, which will send
notification to defense counsel and probation.

        /s/

NICHOLAS J. MARSHALL
Assistant United States Attorney